UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

RALPH K. FREEMAN, )
)
    Plaintiff, )
) Case No. 1:09-CV-324
v. )
)
WAL-MART STORES EAST, LP, )
)
    Defendant. )

## **MEMORANDUM**

Plaintiff Ralph K. Freeman ("Mr Freeman"), acting *pro se*, brings this diversity action to recover damages for injuries allegedly arising from a receipt check stop by a door greeter employed by Defendant Wal-Mart Stores East, LP ("Wal-Mart"). Before the Court Is Wal-Mart's motion for summary judgment, which is supported by a memorandum (Court File Nos. 43, 44). Mr. Freeman has not filed a response.[1] For the reasons set forth in this memorandum, the Court will **GRANT** Wal-Mart's motion for summary judgment (Court File No. 43).

### I.     RELEVANT FACTS[2]

On December 24, 2008, Chattanooga police officer Ralph Freeman went to the Wal-Mart store in Ooltewah, Tennessee to do some last-minute Christmas shopping. He had arranged to meet fellow police officer Edwin McPherson there, who also needed to buy some Christmas items. The

---

[1]On January 28, 2011, twenty-five days after the deadline for responding had passed, Mr. Freeman filed a motion for extension of time to file a response (Court File No. 47), which the Court denied (Court File No. 48).

[2]Wal-Mart has manually filed videos captured from the store's security cameras which depict much of the relevant conduct giving rise to this lawsuit. These videos do not contain audio. They are cited herein as "Video 1," "Video 2," and so forth, and contain relevant timestamps.

two planned to eat lunch together after they finished shopping. Both men were wearing plain clothes, and were armed. They are both African-American. After spending about 30 minutes browsing the merchandise, Mr. Freeman and Mr. McPherson paid for their purchases at the counter in the electronics department at the back of the store. They then walked towards the front of the store to leave.

The front of this Wal-Mart store contains an Electronic Article Surveillance ("EAS") system, comprised of a set of sensors customers walk through when they enter and leave the store. The EAS system is designed to alert Wal-Mart employees when merchandise that has not been paid for is leaving the store. All Wal-Mart merchandise is labeled with small transmitters containing unique serial numbers. When a cashier scans an item, the register electronically communicates to the EAS system that the merchandise bearing that transmitter is "cleared" to leave the store. When a transmitter which has not been "cleared" passes through the EAS sensors, an alarm sounds. Beyond the EAS sensors are a set of sliding glass doors, separating the interior of the store from an "intermediate zone" containing vending machines and shopping carts. This intermediate zone is bounded by another set of sliding glass doors which open to the outside.

On this particular day, 71 year-old Bill Walker, a Wal-Mart store greeter, was standing just before the EAS system (*see* Video 1 at 11:35:41). Mr. Walker is white. Part of Mr. Walker's job responsibilities included stopping customers whose merchandise activated the EAS system and comparing their merchandise to their receipts (Court File No. 43-5, ¶ 3). As Mr. Freeman and Mr. McPherson approached the EAS system, the alarm went off.[3] Mr. Walker asked to see their receipts,

---

[3]There is some question as to precisely when the alarm began sounding. Mr. Freeman recalls the alarm going on and off intermittently before he and Mr. McPherson arrived at the EAS sensors, and as they arrived at the sensors (Court File No. 43-1, p. 10). Mr. Freeman does not recall whether

and the two men stopped in front of him. Mr. McPherson produced his receipt and handed it to Mr. Walker. However, as Mr. Walker examined Mr. McPherson's receipt, Mr. Freeman, who had been standing roughly behind Mr. McPherson, walked behind the back of Mr. Walker, through the EAS sensors, and proceeded towards the doors (*see* Video 1 at 11:36:00).

As Mr. Freeman approached the doors, Mr. Walker, now several feet behind him, turned and raised his arm, and yelled something to the effect of "hey" or "I need to see your receipt" (Court File Nos. 43-2, p. 3, 43-5, ¶ 7). Mr. Freeman claims he never heard Mr. Walker call out anything to him (Court File No. 43-1, p. 11), though the video shows Mr. Freeman turning and looking back at Mr. Walker as Mr. Walker raised his arm and called out to him (*see* Video 1 at 11:36:05). After turning briefly to look at Mr. Walker, Mr. Freeman turned away again and proceeded through the set of doors leading into the intermediate zone.

As Mr. Freeman walked through these doors, Mr. Walker turned and started jogging after him. Catching up with him, Mr. Walker reached out his left arm and made contact with Mr. Freeman's right shoulder, saying "sir, I need your receipt" (Court File No. 43-5, ¶ 7).[4] Immediately

---

the alarms continued to sound after he went through the EAS sensors and approached the doors (*id.* at pp. 11-12). However, according to Mr. Walker's recollection, the alarm began sounding as Mr. Freeman and Mr. McPherson walked through the sensors (Court File No. 43-5, ¶¶ 4-5). Mr. McPherson recalls the alarm started sounding as a man several feet ahead of him and Mr. Freeman walked through the sensors (Court File No. 43-2, p. 4). Mr. McPherson states that man turned and walked back towards Mr. Walker and opened his bag to show him the contents, before continuing to the exit (*id.* at pp. 3-5). As will be explained below, the factual question of when the alarm began sounding is not material to the disposition of Mr. Freeman's claims.

[4]Mr. Walker has described this contact as a "brush" (Court File No. 43-5, ¶ 7), while Mr. Freeman has characterized it as "like a hit, grab, like, you know, like somebody grabbed you and, you know, you're startled, to startle you" (Court File No. 43-1, p. 12). Mr. McPherson has described the contact as a "grab" or a "touch" (Court File No. 43-2, p. 3). The video footage shows what appears to be light to moderate open-hand contact between Mr. Walker's outstretched arm and Mr. Freeman's shoulder (*see* Video 1 and Video 6 at 11:36:09).

3

upon contact, Mr. Freeman turned and shoved Mr. Walker hard with two hands. Mr. Walker was propelled backwards, crashed into a vending machine, and ended up on his back on the floor (*see* Video 1 and Video 5 at 11:36:11). Mr. Freeman then came and stood over Mr. Walker until a customer ran up and confronted Mr. Freeman, at which time Mr. Freeman began shoving and grappling with the customer (*see* Video 5 at 11:36:15, Video 7 at 11:36:35).

Mr. Freeman did not sustain any physical injury or require any medical treatment as a result of Mr. Walker's contact with his shoulder (Court File No. 43-1, pp. 15, 29). However, he did experience substantial embarrassment and humiliation after a video of the incident was picked up by local and national media (*id*. at pp. 21-22).[5] The Chattanooga Police Department suspended Mr. Freeman for 28 days as punishment for his conduct (*id*. at p. 22). Additionally, Mr. Freeman claims he has been ostracized in Chattanooga, has been talked about in the media for over a year, and has even had a parody song written about him (*id*. at p. 22). Because of this emotional trauma, he has sought counseling from his brother Rodney Freeman, a local minister and unlicensed counselor (*id*. at 29; Court File No. 43-3, pp. 2, 6).

## II. STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir.

---

[5]Mr. Freeman does not allege Wal-Mart leaked this video; in fact, he believes Wal-Mart did not want the video to be seen (Court File No. 43-1, p. 22).

2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

**III.    ANALYSIS**

Mr. Freeman has sued Wal-Mart, seeking to recover solely for his emotional injuries. His theories of recovery are fourfold: (1) Mr. Walker assaulted him; (2) Mr. Walker's request to see his receipt was an instance of unlawful racial profiling and discrimination; (3) Wal-Mart was negligent in its hiring, training, and supervision of Mr. Walker; and (4) Wal-Mart negligently or intentionally inflicted emotional distress on him by failing to issue a public statement following the incident saying, in effect, "we made a mistake, we're sorry, we don't attack our customers, it was just a big

5

misunderstanding" (Court File No. 43-1, p. 22). He seeks compensatory and punitive damages. Wal-Mart has moved for summary judgment on all claims.

**A.     Assault**

Mr. Freeman claims Mr. Walker assaulted him by making physical contact with his shoulder. Mr. Freeman asserts Wal-Mart, as Mr. Walker's employer, is vicariously liable for this tort. Under Tennessee law, employers are vicariously liable for torts committed by their employees while acting within the scope of their employment. *White v. Revco Disc. Drug Ctrs., Inc.*, 33 S.W.3d 713, 718 (Tenn. 2000). Prior to finding an employer vicariously liable it must be determined the employee, in fact, committed a tort. *See Creech v. Addington*, 281 S.W.3d 363, 373 (Tenn. 2009) ("It is well-established, for example, that vicarious liability for the principal is extinguished when the agent himself is exonerated for the actions giving rise to the liability.").

Here, in order for Wal-Mart to be vicariously liable for the alleged assault by Mr. Walker, Mr. Freeman must prove Mr. Walker in fact assaulted him. Under Tennessee statute, a person commits assault who:

> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
>
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
>
> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.

Tenn. Code Ann. § 39-13-101(a). In its comments on this statute, the Tennessee Sentencing Commission explains the higher *mens rea* requirement of subdivisions (2) and (3):

> Subdivision (a)(3) extends beyond "bodily injury" and proscribes physical contact that a "reasonable person" would consider extremely offensive or provocative. Since bodily injury is more harmful than physical contact, it is punished if done intentionally, knowingly or recklessly. Both fear of bodily injury and [extremely

offensive] physical contact must be done intentionally or knowingly to constitute assault; recklessness is not sufficient.

*Id*. Sentencing Commission Comments.

Any alleged assault by Mr. Walker clearly cannot be established under subdivisions (1) and (2) of Tenn. Code Ann. § 39-13-101(a). It is uncontested Mr. Freeman did not suffer any bodily injury from Mr. Walker's contact with his shoulder (Court File No. 43-1, p. 15). Neither is there any evidence suggesting Mr. Freeman reasonably feared imminent bodily injury. Mr. Walker approached Mr. Freeman from behind, thus Mr. Freeman could not have feared any imminent bodily injury prior to the physical contact between him and Mr. Walker actually occurring. Furthermore, as is plainly evident from the video, Mr. Walker's physical contact with Mr. Freeman's shoulder was of such a mild nature it would not cause any reasonable person to fear imminent bodily injury. Moreover, any reasonable person — much less a strong, armed police officer — who was walking away from an elderly store clerk while an alarm sounded, ignoring the clerk's instruction to show his receipt, would infer a hand on the shoulder was from the clerk, not an assailant intending to cause him imminent bodily harm.

Neither can Mr. Freeman prove an assault under subdivision (3) of Tenn. Code Ann. § 39-13-101(a). To show Mr. Walker assaulted him under this subdivision, Mr. Freeman would have to establish Mr. Walker intentionally caused physical contact with him that a reasonable person would regard as extremely offensive or provocative. Although the statute does not define "extremely offensive" and "provocative," in *State v. Smiley*, 38 S.W.3d 521, 525 (Tenn. 2001) the court looked to the common law of torts to fill in these terms' meaning:

> In the law of torts where the concept of offensive contact originated, offensive contact is generally defined as contact that "offends a reasonable sense of personal dignity." Cited examples include: kissing without one's consent, cutting one's hair

7

without consent, or spitting in one's face. We find such examples indicative of what is meant by extremely offensive or provocative conduct.

*Id.* (citation omitted).

In this case, the alleged "extremely offensive" or "provocative" physical conduct consists of contact between Mr. Walker's hand and Mr. Freeman's shoulder. The video footage shows this contact to be brief and mild. Even construing the contact as a "grab" rather than a "touch" (*see* Court File Nos. 43-1, p. 12, 43-5, ¶ 7), it cannot plausibly be described as contact "that offends a reasonable sense of personal dignity," akin to unwanted kissing or spitting in someone's face. *See Smiley*, 38 S.W.3d at 525. On the contrary, a reasonable person would regard the shoulder contact at issue here as an inoffensive and appropriate act by a store clerk trying to get the attention of a customer ignoring his verbal requests to show his receipt.

Because Mr. Freeman did not sustain a bodily injury, was not reasonably put in fear of imminent bodily injury, and could not reasonably have regarded Mr. Walker's contact with him "extremely offensive or provocative," he cannot show he was assaulted by Mr. Walker. Consequently, Wal-Mart cannot be held vicariously liable for Mr. Walker's alleged assault. Accordingly, Wal-Mart is entitled to summary judgment on the assault claim.

B.   **Racial Profiling**

Mr. Freeman claims Mr. Walker's conduct in asking to see his receipt and touching his shoulder constituted unlawful racial profiling or discrimination, in violation of Tenn. Code Ann. § 4-21-501, which states:

> Except as otherwise provided in this chapter, it is a discriminatory practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of a place of public accommodation, resort or amusement, as defined in this chapter, on the grounds of race, creed, color, religion, sex, age or national origin.

Under Tennessee law, "the plaintiff bears the initial burden of establishing a prima facie case [of racial discrimination]." *Phillips v. Interstate Hotels Corp. #L07*, 974 S.W.2d 680, 684 (Tenn. 1998). If the plaintiff meets this burden, "the burden of production then shifts to the defendant to proffer a legitimate non-discriminatory reason for the challenged actions." *Id*. If the defendant produces a legitimate non-discriminatory reason, it negates the plaintiff's prima facie case and the burden "shifts back to the plaintiff to show that the defendant's proffered explanation was a pretext for discrimination." *Id*.

To establish a prima facie case of racial discrimination vis-a-vis public accommodation, a plaintiff must show: (1) he is a member of a protected class; (2) the defendant operated a place of public accommodation; and (3) he was denied access to the defendant's place of public accommodation. *Id*. A plaintiff may establish the denial-of-access requirement by showing he was literally denied access, as well as by showing he was subjected to disparate treatment which had the effect of deterring access. *Id*.

In this case, the first and second elements are plainly established: Mr. Freeman is African-American, and Wal-Mart is a place of public accommodation. However, Mr. Freeman has presented no evidence supporting the denial-of-access requirement, either through literal denial or disparate treatment. It is undisputed Mr. Freeman was not *literally* denied access to Wal-Mart's store. In deposition testimony he admits he has never been denied access to Wal-Mart, and he has been back to shop several times since the incident giving rise to this lawsuit (Court File No. 43-1, pp. 19-20).

Neither has Mr. Freeman presented any evidence he was subject to disparate treatment. The only basis for a claim of disparate treatment seems to be the fact Mr. Freeman was stopped and asked for his receipt, while other individuals were not. However, this fact, standing alone, is

9

insufficient to show Mr. Freeman was treated disparately from others not in his racial class. To the contrary, the video footage shows at least five individuals who appear to be African-American passing through the EAS system in the seconds before Mr. Freeman and Mr. McPherson were stopped, none of whom was asked to present their receipts. Quite simply, there is no evidence before the Court suggesting Mr. Walker or Wal-Mart treated African-Americans differently than members of any other race with respect to receipt checks. *Compare with United States v. Glass Menagerie, Inc.*, 702 F. Supp. 139, 143 (E.D. Ky. 1988) (finding providing VIP cards to white patrons and not black patrons and allowing only white patrons to use VIP entrance was disparate treatment amounting to denial-of-access); *Phillips*, 974 S.W.2d at 684 (stating requiring multiple forms of identification only from members of a protected class would be disparate treatment designed to deter access).

Moreover, even if Mr. Freeman could present a prima facie case of racial profiling or discrimination, Wal-Mart has carried its ensuing burden of showing a legitimate, non-discriminatory reason for Mr. Walker's stop of Mr. Freeman. It is Wal-Mart policy for the greeter to request a receipt from any customer who activates the EAS alarm system (Court File No. 43-4, ¶ 8). Mr. Walker believed merchandise carried either by Mr. Freeman or Mr. McPherson set off the EAS alarm (Court File No. 43-5, ¶ 5). Accordingly, he responded by asking to see their receipts. This was an legitimate and non-discriminatory reason for stopping Mr. Freeman, and there is absolutely no evidence suggesting it was actually a pretext for racial discrimination.

Because Mr. Freeman cannot show he was denied access to Wal-Mart, either directly or through disparate treatment, he cannot make out a prima facie case of racial profiling or discrimination, in violation of Tenn. Code Ann. § 4-21-501. Even if he could make out a prima facie

case, however, Wal-Mart has proffered a legitimate, non-discriminatory reason for Mr. Walker's stop of Mr. Freeman, which Mr. Freeman cannot show to be pretextual. Accordingly, Wal-Mart is entitled to summary judgment on the racial discrimination claim.

**C.    Negligence**

Mr. Freeman alleges Wal-Mart was negligent in the hiring, training, and supervision of Mr. Walker. To establish a general claim for negligence in Tennessee, a plaintiff must prove the following elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009). To prove proximate cause under a negligent supervision theory, a plaintiff must show the harm caused by the employee's action was foreseeable not just to the employee, but to the employer. *See Smith v. Keyport Self-Storage*, No. W1998-00810-COA-R3-CV, 2000 W.L 558604 at *4 (Tenn. Ct. App. May 5, 2000); *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992).

Here, there is no evidence Wal-Mart was negligent in the hiring, training, and supervision of Mr. Walker. As explained during the Court's discussion of the assault and discrimination claims, Mr. Walker did not act tortiously or otherwise unlawfully in his interaction with Mr. Freeman. Phrased differently, from the perspective of the law, Mr. Walker's conduct was entirely appropriate. It is axiomatic Wal-Mart does not breach a duty of care owed to its customers by hiring, training, and supervising an employee whose conduct is entirely appropriate. Hence, given the Court's conclusion Mr. Walker did not assault or discriminate against Mr. Freeman, the negligent hiring, training, and supervision claims against Wal-Mart must fail as a matter of law.

Moreover, there is nothing in the record suggesting Wal-Mart had any reason to foresee

11

violent, tortious, or racist conduct by Mr. Walker. Prior to the incident giving rise to this lawsuit, Mr. Walker had never touched a customer in an offensive manner or exhibited any violent or aggressive behavior which would indicate he was a potential threat to others (Court File No. 43-4, ¶ 4). Neither had he ever indicated any racial prejudices (*id*. at ¶ 7). On numerous occasions he had stopped white customers when they activated the EAS alarm (Court File No. 43-5, ¶11). Mr. Freeman offers no evidence to the contrary; in fact, in his deposition he admitted he had no knowledge suggesting Wal-Mart knew or should have known of any risk posed by Mr. Walker, nor did he know anything about Mr. Walker's training:

> Q: And is there anything else, any other reason Wal-Mart should have suspected that he might assault you?
>
> A: If Wal-Mart knows he's got a history — I don't know what his history was. I don't know what his training was. I don't know why, if Wal-Mart knows he's a little aggressive, why they would have him in that position. I mean, Wal-Mart has some answering —
>
> Q: Do you have any evidence that Wal-Mart had any information to indicate that Mr. Walker shouldn't have been in that position doing that job?
>
> A: I have no evidence. Wal-Mart wouldn't give me any. If they had it, they wouldn't give it to me. . . .
>
> Q: Identify all the evidence you have, sitting here today, that indicates that Wal-Mart either knew or should have known of any negative racial views or behaviors by Mr. Walker before this incident.
>
> A: I don't have any evidence, but Wal-Mart should have known.

(Court File No. 43-1, pp. 25-26). Mr. Freeman's negligence claims against Wal-Mart rely on nothing more than bare assertion. He asserts Wal-Mart was deficient in its training of Mr. Walker, though he admits he knows nothing about the training Mr. Walker received. He asserts Wal-Mart should have known about violent or racist propensities possessed by Mr. Walker and therefore

refrained from hiring him or supervised him more closely, though he admits his opinion is unsupported by evidence. Although as the non-movant Mr. Walker is entitled to the Court's favorable construal of the evidence, he is not entitled to a trial based merely on unsupported allegations. *See Celotex*, 477 U.S. at 324.

Because Mr. Walker did not act wrongfully towards Mr. Freeman, Mr. Freeman cannot, as a matter of law, show Wal-Mart breached the duty of care owed to Mr. Freeman through its hiring, training, and supervision of Mr. Walker. Moreover, there is no evidence in the record suggesting Wal-Mart should have foreseen any wrongful conduct by Mr. Walker. Accordingly, Wal-Mart is entitled to summary judgment on the negligence claims.

### D.     Emotional Distress

The precise nature of Mr. Freeman's emotional distress claims are difficult to discern, but he appears to allege Wal-Mart caused him actionable emotional distress by failing to issue a public statement criticizing Mr. Walker, vindicating himself, and correcting certain media misperceptions. His complaint alleges this infliction of emotional distress was both intentional and negligent.

#### 1.     Intentional Infliction of Emotional Distress

In order to prove intentional infliction of emotional distress ("IIED") in Tennessee, a plaintiff must show all of the following elements: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). The court cannot accept a plaintiff's conclusory allegations, but must determine for itself whether conduct is actionably outrageous, or merely "insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Swallows v. Western Elec. Co.*, 543 S.W.2d 581,

13

583 (Tenn. 1976) (quotation omitted). Liability attaches only to conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

Here, there is no evidence Wal-Mart intentionally engaged in conduct so outrageous as to support a claim of IIED. In fact, the "conduct" Mr. Freeman blames for his emotional distress is actually inaction: Wal-Mart's failure to affirmatively set the record straight, as Mr. Freeman sees it, by publicly declaring, "hey, we made a mistake, we're sorry, we don't attack our customers, it was just a big misunderstanding and all is, you know, all is well" (Court File No. 43-1, p. 22). However, Mr. Freeman admits Wal-Mart did not leak the surveillance video to the media (*id.*). He also affirms the video is true and accurate, and, he believes, shows his actions to be entirely appropriate (*id.* at p. 24). This Court is aware of no law or precedent suggesting a business's decision to remain silent in the face of a media fracas not of its own making could be construed as "atrocious" conduct, "intolerable in a civilized community." Much less does the Court see how this could be the case when the fracas concerns a concededly accurate video, depicting conduct the plaintiff believes to be self-evidently appropriate. Any embarrassment Mr. Freeman has suffered comes as a result of the media's and public's perception of the video; Wal-Mart's decision not to make an effort to influence that perception is simply not intentional outrageous conduct which can give rise to IIED liability. Accordingly, Wal-Mart is entitled to summary judgment on the IIED claim.

 2. **Negligent Infliction of Emotional Distress**

Tennessee applies the general negligence framework to claims of negligent infliction of

14

emotional distress (NIED). *Barrett v. Whirlpool Corp.*, 704 F.Supp.2d 746, 758 (M.D. Tenn. 2010) ("The Tennessee Supreme Court has adopted a general negligence standard for claims of negligent infliction of emotional distress."). However, recovery is limited only to instances of "serious" or "severe" emotional injury. *Camper v. Minor*, 915 S.W.2d 437, 446 (Tenn. 1996). "A 'serious' or 'severe' emotional injury occurs where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Id.* (quotation omitted). A plaintiff who has suffered only emotional distress, with no related physical injury, can only support a claim of NIED by submitting expert medical or scientific proof of severe emotional injury. *Id.*

Here, Mr. Freeman cannot make out a claim for NIED for multiple reasons, namely: Wal-Mart's public silence on the incident was not a breach of the duty of care owed to Mr. Freeman; evidence does not indicate Mr. Freeman's emotional injuries were "serious" or "severe;" and Mr. Freeman — who undisputedly suffered no physical injury — has not submitted expert or scientific proof of severe emotional injury.

This Court is aware of no duty incumbent on a retail establishment to issue press releases or other statements designed to sway public opinion on the character of one of its patrons. Because Wal-Mart did not owe Mr. Freeman such a duty, Wal-Mart's decision to maintain public silence was not a breach of a duty of care. Hence, Mr. Freeman cannot establish an essential element of NIED, namely, negligence.

Additionally, Mr. Freeman has presented insufficient evidence to show his alleged emotional injuries were "serious" or "severe." In *Barrett*, the court found a plaintiff's allegations of being "'constantly on edge,' 'stressed,' and worried about [her alleged sexual harasser], and that she lost

15

sleep" to fall short of the "serious" or "severe" injuries needed to sustain an NIED claim. *Barrett*, 704 F.Supp.2d at 758. Similarly, the Court does not consider Mr. Freeman's allegations of embarrassment and humiliation following public exposure of his interaction with Mr. Walker something a "reasonable person, normally constituted, would be unable to adequately cope with." *Camper*, 915 S.W.2d at 446.

Finally, Mr. Freeman does not have expert medical or scientific proof of severe emotional injury — a requirement in a case such as this where no physical injury is alleged. *See id*. Although Mr. Freeman has sought emotional help from his brother following the incident, Mr. Freeman's brother is not a licensed counselor or therapist, nor is there any indication he was working under the guidance or supervision of one (Court File No. 43-3, p. 6). *See* Tenn. Code Ann. § 33-3-201(2) ("'Counselor' means any psychiatrist, psychologist, licensed psychologist with health service provider designation, certified or licensed marital and family therapist, certified or licensed professional counselor, certified or licensed social worker, or other professional trained in the field of psychiatry or psychology or any nonprofessional person acting under the guidance or supervision of the professionals."). Moreover, the Court does not have before it any statement by Mr. Freeman's brother indicating Mr. Freeman suffered severe emotional injury.

Mr. Freeman cannot show Wal-Mart breached a duty of care owed him, he has not alleged "serious" and "severe" emotional injuries, and he does not have expert medical or scientific proof of severe emotional injury. Accordingly, Wal-Mart is entitled to summary judgment on the NIED claim.

## IV. CONCLUSION

The Court finds there is no genuine issue as to any material fact in Mr. Freeman's claims against Wal-Mart. Accordingly, the Court will **GRANT** Wal-Mart's motion for summary judgment (Court File No. 43). There being no other issues in this case, the Court will **ORDER** this case **DISMISSED**.

An Order shall enter.

**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**